| | |
|---|---|
| WINSTON HENSLEY, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>MOLSON COORS BEVERAGE COMPANY USA LLC, MOLSON COORS BEVERAGE COMPANY USA LLC GOVERNANCE COMMITTEE, MOLSON COORS BEVERAGE COMPANY USA LLC BENEFIT PLAN INVESTMENT SUBCOMMITTEE, and JOHN DOES 1-20,<br><br>    Defendants. | **CIVIL ACTION NO.:** |

## CLASS ACTION COMPLAINT

Plaintiff, Winston Hensley ("Plaintiff"), by and through his attorneys, on behalf of the Molson Coors Employees' Retirement and Savings Plan (f/k/a the MillerCoors LLC Employees' Retirement and Savings Plan)[1] (the "Plan"),[2] himself and all others similarly situated, states and alleges as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Molson Coors Beverage Company USA LLC ("Molson" or "Company"), and the Molson Coors Beverage Company USA LLC Governance Committee and

---

[1] "[T]he MillerCoors LLC Employees' Retirement and Savings Plan is amended and restated as the Molson Coors Employees' Retirement and Savings Plan effective as of January 1, 2020." Molson Coors Employees' Retirement and Savings Plan, restated effective as of January 1, 2020 ("Plan Doc."), at Preamble.

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

its members ("Governance Committee"), and Molson Coors Beverage Company USA LLC Benefit Plan Investment Subcommittee and its members ("Investment Subcommittee") (collectively, the Governance Committee and the Investment Subcommittee are referred to as the "Committees"), for breaches of their fiduciary duties.

2. The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Molson Coors Employees' Retirement and Savings Plan (ERSP) Summary Plan Description, revised January 2022 ("SPD"), at 36 ("As a defined contribution plan individual accounts for participants are maintained in the Plan's trust fund based on contributions to each account, increased by any investment gains or reduced by any investment losses."); *see also* Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution 401(k) savings plan applicable to salaried and hourly non-union employees.").

3. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021).

4. The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers." [3]; *see also Tibble v.*

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

*Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.  Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.  "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

7.  Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.  The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

3

9.     Plaintiff alleges that during the putative Class Period, Defendants, as a "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of cost and performance.

10.     At all times during the Class Period, the Plan had over one and one-half billion dollars in assets under management. At the Plan's fiscal year end in 2019, the Plan had $1,875,696,651 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan, Schedule H, at 2.

11.     By 2023, the Plan had $1,969,860,838 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H, at 2.

12.     The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 9,702 participants. *See* 2019 Form 5500 for the Plan, at 2. By 2023, the Plan had 9,725 participants. *See* 2023 Form 5500 for the Plan, at 2.

13.     With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed income fund with lower crediting rates when compared to available similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

14.     Specifically, Defendants allowed substantial assets in the Plan to be invested in the Fidelity Stable Value Fund ("Fidelity SVF"), a "synthetic investment contract." Auditor's Report, attached to 2023 Form 5500, at 13. The Fidelity SVF carried significantly more risk and provided a significantly lower rate of return than other comparable funds that Defendants could have made available to Plan participants. The Fidelity SVF invested in synthetic GICs offered by JP Morgan Chase ("JP Morgan"), Prudential Insurance Company America ("Prudential"), Nationwide Life

4

Insurance Company ("Nationwide"), Transamerica Premier Life ("Transamerica"), Pacific Life Insurance Company ("Pacific Life"), American General Life ("American General"), Metropolitan Life Insurance Company ("MetLife"), Lincoln National Life Insurance Company ("Lincoln National"), State Street Bank & Trust Company ("State Street"), and Massachusetts Mutual Life Insurance Company ("MassMutual") (collectively, JP Morgan, Prudential, Nationwide, Transamerica, Pacific Life, American General, MetLife, Lincoln National, State Street and MassMutual are referred to as the "Insurance Companies"), that provided significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants.

15. A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

16. The Insurance Companies benefited significantly from participants in the Plan investing in the Fidelity SVF. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Fidelity SVF was benefitting the Insurance Companies at the expense of the participants in the Plan.

17. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

18. Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I), and failure to monitor fiduciaries (Count II).

## II. JURISDICTION AND VENUE

5

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

20. This Court has personal jurisdiction over Defendants because the Plan is administered in this District, meaning Molson transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

21. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Molson does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

### Plaintiff

22. Plaintiff, Winston Hensley ("Hensley"), resides in McGaheysville, Virginia. During his employment, Plaintiff Hensley participated in the Plan. Mr. Hensley invested in the Fidelity SVF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Fidelity SVF.

23. Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

6

24. Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

25. Molson Coors Beverage Company USA LLC is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 3939 West Highland Boulevard, Milwaukee, Wisconsin. *See* 2023 Form 5500, at 1. Molson manufactures, markets, and sells beer and other malt beverage products in the Americas, Europe, the Middle East, Africa, and the Asia Pacific.

26. During the putative Class Period, the Company is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because it had control over Plan management and/or authority or control over management or disposition of Plan assets.

27. "The . . . Governance Committee . . . is appointed by the Chief Financial Officer and acts as a fiduciary of the Plan." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 7.

28. Molson, through its Chief Financial Officer, appointed the Governance Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. As will be discussed below, the Governance Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

7

29.     Accordingly, Molson during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Governance Committee.

30.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Governance Committee Defendants

31.     As discussed above, Molson appointed the Governance Committee to, among other things, ensure that the investments available to Plan participants are appropriate. *See* Plan Doc., at 37 ("investment matters which shall be the responsibility of the [Governance] Committee, the Investment Subcommittee and the Trustee."); *see also id*., at 51 ("The [Governance] Committee, through the Investment Subcommittee, shall direct the Trustee with respect to the investment of the Fund. The [Governance] Committee has delegated to the Investment Subcommittee certain of its responsibilities to monitor the management and investment of the Fund. . . . The [Governance] Committee and the Investment Subcommittee (as appropriate) shall direct the Trustee with respect to the investment of the Fund and will act in accordance with their respective Charters.").

32.     The Governance Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

33.     Further, the Governance Committee during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Investment Subcommittee.

34.     The Governance Committee and unnamed members of the Governance Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Governance Committee Defendants."

### Investment Subcommittee Defendants

8

35.     "The Investment Subcommittee may provide for the creation of one or more Investment Funds within the Fund (the "Investment Funds")." Plan Doc., at 51.

36.     "It is intended that the Investment Subcommittee shall endeavor to exercise its discretion so that the Plan and its fiduciaries will be entitled to relief under ERISA Section 404(c), and the [Governance] Committee and the Investment Subcommittee shall have full authority to take all actions they deem necessary to comply with Section 404(c)." *Id*.

37.     The Investment Subcommittee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over management or disposition of Plan assets.

38.     The Investment Subcommittee and unnamed members of the Investment Subcommittee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Investment Subcommittee Defendants."

## IV.     CLASS ACTION ALLEGATIONS [5]

39.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Molson Coors Employees' Retirement and Savings Plan (f/k/a the MillerCoors LLC Employees' Retirement and Savings Plan), at any time between September 9, 2019 through the date of judgment (the "Class Period").

---

[5] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[6] Plaintiff reserves the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

9

40. The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 9,725 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 for the Plan, at 2.

41. Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

42. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A. Whether Defendants are/were fiduciaries of the Plan;

    B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

    C. Whether the Company failed to adequately monitor the Governance Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D. The proper form of equitable and injunctive relief; and

    E. The proper measure of monetary relief.

43. Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

10

44. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

45. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

46. "The Plan is a defined contribution 401(k) savings plan applicable to salaried and hourly non-union employees of Molson Coors Beverage Company USA LLC (Molson Coors) and The Yuengling Company LLC (Yuengling)." Auditor's Report, attached to 2023 Form 5500, at 7.

47. Included in the Plan's available funds was the Fidelity SVF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Plan, at 17.

48. At the end of 2019, $246,747,000 in Plan assets were invested in the Fidelity SVF. *See* Schedule H, Line 4I – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Plan, at 16.

49. By the end of 2023, $209,299,000 in Plan assets were invested in the Fidelity SVF. *See* Schedule H, Line 4I – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Plan, at 17.

11

50. The chart below demonstrates the amount of Plan assets invested in the Fidelity SVF during the Class Period.

| Plan Year | Plan Assets in Fidelity SVF |
|---|---|
| 2019 | $246,747,000 |
| 2020 | $279,079,000 |
| 2021 | $254,396,000 |
| 2022 | $256,571,000 |
| 2023 | $209,299,000 |

*Eligibility*

51. In general, the Plan covers all employees of Molson. *See* SPD, at 2. ("You are eligible to participate in the Plan on your date of hire if you are an active, non-union employee of the Company.").

*Contributions*

52. Eligible employees may elect to make contributions to their Plan accounts. *See* SPD, at 4 ("You can contribute from 1% to either 55% or 75% of your compensation, in whole percentages but not to exceed the amounts specified under Section 401(k) of the Internal Revenue Code (the "Code") or which result in pay insufficient to meet all federal, state, and local payroll tax deduction requirements and any other mandatory deductions.").

53. Molson makes matching contributions to Plan accounts. *See* SPD, at 7 ("The Company will make matching contributions for you equal to 100% of your salary reduction contributions (including your catch-up contributions) up to, but not exceeding, 4% of your annual compensation.").

54. Like other companies that sponsor 401(k) plans for their employees, Molson enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at

the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

55.    Molson also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

56.    Given the size of the Plan, Molson likely enjoyed a significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

57.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

58.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

59.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

13

60. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[7]

61. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

62. A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

63. With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

64. The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

65. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

---

[7] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

66. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

67. It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

68. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

69. Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

70. In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on June 20, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or

15

appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

71. By email dated July 25, 2025, the Plan's administrator responded to Plaintiff's request refusing to provide documents pertaining to request # 10, which was "Minutes of any meetings of the Plan's investment committee, or other governing entity of the Plan (and all committees and subcommittees thereof) including all exhibits, attachments, and documents referenced in the minutes…."

72. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

73. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

74. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Fidelity SVF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B. Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Fidelity SVF**

**1. The Plan's Inclusion of the Fidelity SVF**

75. At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Fidelity SVF.

76. The Form 5500s Auditor's Report state as follows:

The Plan holds one synthetic investment contract. This contract meets the fully benefit-responsive investment contract criteria, and therefore, is reported at contract value. Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan.

[…]

The key difference between a synthetic investment contract and a traditional investment contract is that the Plan owns the underlying assets of the synthetic investment contract. A synthetic investment contract includes a wrapper contract(s), which is an agreement for the wrap issuer, such as a bank or insurance company, to make payments to the Plan in certain circumstances. The wrapper contract typically includes certain conditions and limitations on the underlying assets owned by the Plan. With traditional investment contracts, the Plan owns only the contract itself. Synthetic and traditional investment contracts are designed to accrue interest based on crediting rates established by the contract issuers.

The synthetic investment contract held by the Plan includes a wrapper contract(s) that provides a guarantee that the credit rate will not fall below 0%. Cash flow volatility (for example, timing of benefit payments) as well as asset underperformance can be passed through to the Plan through adjustments to future contract crediting rates. A formula is provided in the contract that adjusts the renewal crediting rate to recognize the difference between the fair value and the book value of the underlying assets. The crediting rate is reviewed periodically for resetting.

The Plan's ability to receive amounts due in accordance with the fully benefit-responsive investment contract is dependent on the third-party issuer's ability to meet its financial obligations. The issuer's ability to meet its contractual obligations may be affected by future economic and regulatory developments.

Certain events might limit the ability of the Plan to transact at contract value with the contract issuer. These events may be different under each contract.

[…]

17

> There are no probable events anticipated that might limit the ability of the Plan to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants.[8]

77. For these reasons, the Fidelity SVF's crediting rates can be compared to traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) do not permit the insurance companies to terminate the agreements before the end of the contract, (3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance carriers. The Fidelity SVF's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Fidelity SVF, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

78. Defendants' selection of the imprudent Fidelity SVF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 2. Prudential is at a Substantial Risk of Going Insolvent

#### a. The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

79. Because a guaranteed insurance account product is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer. It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

80. A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable. It said these agencies shared blame for the 2008 financial crises:

---

[8] *See* Auditor's Report, attached to the 2023 Form 5500, at 13-14.

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

81.     The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations. *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[9]

82.     These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

> **b.     Recent Lawsuits Have Highlighted Prudential's Extreme Risk of Going Insolvent**

83.     Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only

---

[9] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

84. A recently filed lawsuit explained that a "cursory review of [Prudential's] statutory filings reveals a shocking dependence on affiliated party transactions with wholly owned affiliates and captive reinsurers and affiliates in Bermuda." *See Dempsey et al. v. Verizon Communications Inc. et al.*, No. 1:24-cv-10004-AKH (S.D.N.Y. Dec. 30, 2024) at ¶ 53.

85. The lawsuit further explained, among other things, that Prudential's surplus of $16 billion as of the end of 2023 paled in comparison to the alleged potential liabilities of $72.8 billion in affiliated party reinsurance and modified co-insurance ("Modco"). *Id.* at ¶¶ 53-54. In other words, given the meager surplus compared to the potential liabilities put Prudential at an extreme risk of insolvency.

c. **Empower's takeover of Prudential Did Not Alleviate the Severe Risk of Insolvency**

86. "On April 1, 2022, [Empower Annuity Insurance Company of America] completed the acquisition of all the voting equity interests in Prudential Retirement Insurance and Annuity Company, and subsequently renamed the entity to Empower Annuity Insurance Company, as part of the acquisition of …Prudential's Full Service retirement business." Annual Statement for the Year 2024 of Empower Annuity Insurance Company of America, Notes to Financial Statements.

87. As noted above, available surplus is an important data point in determining an L&A carrier's insolvency risk. Based on its insufficient surplus, Prudential/Empower was/is at severe risk of insolvency.

88. To begin, an important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better. The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger,

aggressive private equity-controlled carriers with much lower ratios. During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio. For example, as of 2024, Empower's S/L ratio was less than 1%:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

## LIABILITIES, SURPLUS AND OTHER FUNDS

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | _____ shares common (value included in Line 29 $ _____ ) | | |
| 36.2 | _____ shares preferred (value included in Line 30 $ _____ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus: $ 1,018,399,778  EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 106,414,669,390  Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:** **0.96%**  National Average is About **7.5%**.

89.     There are numerous L&A carriers that have substantially higher S/L ratios than Empower. For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | _____ shares common (value included in Line 29 $ _____ ) | | |
| 36.2 | _____ shares preferred (value included in Line 30 $ _____ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus: $ 26,427,441,247  EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 218,473,153,964  Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:** **12.10%**  National Average is About **7.5%**.

> **d.     Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

90.     Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below)

21

**$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.



91.    Separate and in addition to the reserve credit reported above, Empower has also entered into a ModCo reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:



92.    The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



93. The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer. There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[10]

94. Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition

---

[10] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity" *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insurers-use-of-offshore-reinsurance-527931.aspx.

to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[11] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 10.

> **e.** **Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid and Affiliated Investment Concentrations**

95.     Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

96.     The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

---

[11] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp



97. Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

98. In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

### 3. There are Many GICs in the Marketplace with Competitive Crediting Rates

99. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

100. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates were available to the Plan but were not selected by Defendants.

101. These comparisons include:

- The Pomona Valley Hospital Medical Center Retirement Savings Plan's fully benefit-responsive synthetic GIC, where multiple "traditional investment contracts held by the Plan are guaranteed investment contracts" with multiple "contract issuers." *See* Auditor's Report, attached to the 2023 Form 5500 for the Pomona Valley Hospital Medical Center Retirement Savings Plan, at Note E. "The crediting rates are reviewed quarterly" and, like the Fidelity SVF, "the contracts cannot be terminated before the scheduled maturity date." *Id*. Also like the Fidelity SVF, "[n]o events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*.

- The Baylor College of Medicine Retirement Plan offered a "fully benefit-responsive investment contract" that is "fully and unconditionally guaranteed by Lincoln National Life Insurance Company" – the same carrier used in the Fidelity SVF. Also like the Fidelity SVF, the "The Plan Administrator believes that any events that would limit the Plan's ability to transact at contract value are remote." *See* Auditor's Report, attached to the 2020 Form 5500 for the Baylor College of Medicine Retirement Plan, at Note 5.

- The Gemba Group Annuity Plan offered a synthetic GIC with multiple underlying "guaranteed investment contracts[,]" and the GIC cannot be cancelled "before the scheduled maturity dates." Auditor's Report, attached to the 2021 Form 5500 for the Gemba Group Annuity Plan, at Note 4; *see also id*., at Line 4i (listing the insurance companies). Also like the Fidelity SVF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id*. The Gemba Group Annuity Plan also has a "guaranteed fixed interest fund" which is also a Synthetic GIC because it has multiple "underlying fully benefit-responsive contracts" and, like the Fidelity SVF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id*., at Note 5.

- The Holzer Health System 401(a) Profit Sharing Plan offered a Common collective trust, with multiple "underlying investments (consisting of guaranteed investment contracts, security-backed contracts and common collective trusts)" like the Fidelity SVF. Auditor's Report, attached to the 2021 Form 5500 for the Holzer Health System 401(a) Profit Sharing Plan, at Note 3. "[T]he NAV of the fund is determined daily" and the "[u]nits are issued and redeemed" daily. *Id*. Hence, it was fully benefit-responsive. The assets are listed as assets of the plan. *Id*., at Schedule H. Again, the Fidelity SVF's underlying GICs include collective trusts.

- The Jackson National Life Insurance Company Defined Contribution Plan offered a fully benefit-responsive investment contract that was a "Company-sponsored" annuity "exclusively designed for use in connection with the Plan" and is "backed by the creditworthiness of the Company." *See* Auditor's Report, attached to the 2022 Form 5500 for the Jackson National Life Insurance Company Defined Contribution Plan, at Note 3. The Company (Jackson National Life Insurance Company) is the plan sponsor. Also, the crediting rate is "based on current market rates[,]" not risk. *Id*.

26

- The Transamerica 401(k) Retirement Savings Plan offered a fully benefit-responsive GIC with Transamerica Financial Life Insurance Company ("TFLIC"), an affiliate of the plan sponsor, Transamerica Corporation. The GIC "consists of stable fund segments" with each segment have "a guaranteed rate of interest" like a Synthetic GIC. Auditor's Report, attached to the 2019 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at page 9. The interest rate is determined quarterly. *Id.*, at 10. Like the Fidelity SVF, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id.*, at 11. "TFLIC is not permitted to pay or transfer the value of the contract, without consent from the Plan, prior to the scheduled maturity date." *Id.*

- The Valley Children's Hospital Defined Contribution Retirement Plan offered "a fully benefit-responsive investment contract with Lincoln National Life Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Valley Children's Hospital Defined Contribution Retirement Plan, at Note 4. "The guarantee is based on Lincoln's ability to meet its financial obligations from the general assets of Lincoln" *id.*, which is nonetheless comparable to the Fidelity SVF because Lincon National was the same carrier as one of the underlying GICs in the Fidelity SVF. "The Plan administrator does not believe that any events that would limit the Plan's ability to transact at contract value with participants are probable of occurring." *Id.*

- The HCC Insurance Holdings Inc. 401(k) Plan offered a fully benefit responsive guaranteed investment contract where the "interest rates are reviewed on a quarterly basis for resetting" and, like the Fidelity SVF, "The Plan administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable." Auditor's Report, attached to the 2019 Form 5500 for the HCC Insurance Holdings Inc. 401(k) Plan, at Note 4. The assets of the HCC insurance GIC are Plan assets, albeit held by MassMutual. *Id.*, at Schedule H.

- The American United Life Progress Sharing Plan and Trust offered a "fully benefit-responsive fixed interest investment option with the Company" that "is maintained in the Company's general account" where the rates are "determined quarterly." Auditor's Report, attached to the 2020 Form 5500 for the American United Life Progress Sharing Plan and Trust, at Note 2. The insurance carrier is/was also the plan sponsor. Also, like the Fidelity SVF, "[t]he Plan Administrator does not believe the occurrence of any such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*

- The Auto-Owners Insurance Company Retirement Savings Plan offered a "a fully benefit-responsive investment contract with Auto-Owners Life Insurance Company (AOLIC), a wholly owned subsidiary of Auto-Owners Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at Note 3. Like the Fidelity SVF, "The plan administrator does not believe" that any events that "would limit the Plan's ability to transact at contract value" "is probable", and "The guaranteed investment

contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

- The International Imaging Materials Inc. Retirement and Investment Plan offered a "traditional fully benefit-responsive investment contract[]" carried by Lincoln National Life Insurance Co., who also carries one of the underlying GICs in the Fidelity SVF. Auditor's Report, attached to the 2022 Form 5500 for the International Imaging Materials Inc. Retirement and Investment Plan, at Note 2. The crediting rates are determined "quarterly" and, like the Fidelity SVF, "there are no events that limit the ability of the Plan to transact at contract value with the issuers." *Id*. Although "Lincoln Insurance maintain[s] the contributions in a general account fund" it is listed as plan assets. *Id*., at Note 2 and Schedule H. Rates are based on "factors, including economic and market conditions, the general interest rate environment and the expected and actual return on the portfolio within the general account[,]" not risk. *Id*. What Lincoln deemed reflective of the "economic and market conditions" should be the same for the Fidelity SVF during the same "economic and market conditions."

- The Mattel, Inc. Personal Investment Plan offered a fully benefit-responsive "traditional GIC" where "the contract itself is owned by the Plan." Auditor's Report, attached to the 2023 Form 5500 for the Mattel, Inc. Personal Investment Plan, at Note 3. "The Plan's administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable" and "Mattel is unaware of any events which occurred during 2023 that would allow contract issuers to terminate the contracts held by the Plan." *Id.*

- The Trugreen Profit Sharing and Retirement Plan offered a "a traditional fully benefit-responsive guaranteed investment contract." Auditor's Report, attached to the 2021 Form 5500 for the Trugreen Profit Sharing and Retirement Plan, at Note 4. "The crediting rate is reviewed on a quarterly or semiannual basis for resetting. The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*. "No events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*. Although "MassMutual maintains the contributions in a general account[,]" *id*., the assets are listed as plan assets. *Id*., at Note 4, Schedule H.

102. The Fidelity SVF in the Plan had underwhelming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans (like the ones mentioned above):

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[12] |
|---|---|---|---|---|---|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln National Life Insurance Co. | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company (but multiple underlying contracts) | 3.85% |

---

[12] For crediting rates not specifically identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance. Some Form 5500s listed a range or average yield, but Plaintiff was able to calculate precise crediting rates within the stated range.

Case 2:25-cv-01371-WCG    Filed 09/09/25    Page 29 of 40    Document 1

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Molson Plan** | **9,702** | **$1,875,696,651** | **JP Morgan Chase** | **2.78%** |
| | | | | **Prudential** | **3.19%** |
| | | | | **Transamerica** | **2.75%** |
| | | | | **American General** | **2.78%** |
| | | | | **State Street** | **2.75%** |
| | | | | **Nationwide** | **2.76%** |
| | | | | **Lincoln National** | **2.75%** |
| | | | | **MetLife** | **0.37%** |
| | | | | **Pacific Life** | **2.22%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |

Case 2:25-cv-01371-WCG    Filed 09/09/25    Page 30 of 40    Document 1

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Molson Plan** | **9,588** | **$1,997,068,128** | **JP Morgan Chase** | **2.48%** |
| | | | | **Prudential** | **2.48%** |
| | | | | **Transamerica** | **2.48%** |
| | | | | **American General** | **2.21%** |
| | | | | **State Street** | **2.36%** |
| | | | | **Nationwide** | **2.45%** |
| | | | | **Lincoln National** | **1.91%** |
| | | | | **MetLife** | **1.99%** |
| | | | | **Pacific Life** | **1.97%** |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |

Case 2:25-cv-01371-WCG    Filed 09/09/25    Page 31 of 40    Document 1

| | | | | | |
|---|---|---|---|---|---|
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Molson Plan** | **9,750** | **$2,181,119,773** | **JP Morgan Chase** | **1.90%** |
| | | | | **Prudential** | **1.90%** |
| | | | | **Transamerica** | **1.83%** |
| | | | | **American General** | **1.90%** |
| | | | | **State Street** | **1.90%** |
| | | | | **Nationwide** | **1.65%** |
| | | | | **Lincoln National** | **1.90%** |
| | | | | **MetLife** | **1.56%** |
| | | | | **Pacific Life** | **1.79%** |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |

| Year | Plan | Participants | Assets | Insurer | Percentage |
|------|------|-------------|--------|---------|------------|
|  | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
|  | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
|  | **Molson Plan** | **9,819** | **$1,781,413,018** | **JP Morgan Chase** | **1.85%** |
|  |  |  |  | **Prudential** | **1.85%** |
|  |  |  |  | **Nationwide** | **1.65%** |
|  |  |  |  | **Transamerica** | **0.19%** |
|  |  |  |  | **Pacific Life** | **1.90%** |
|  |  |  |  | **American General** | **1.85%** |
|  |  |  |  | **MetLife** | **1.85%** |
|  |  |  |  | **Lincoln National** | **1.44%** |
|  |  |  |  | **State Street** | **2.70%** |
|  |  |  |  | **MassMutual** | **1.23%** |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
|  | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |

Case 2:25-cv-01371-WCG   Filed 09/09/25   Page 33 of 40   Document 1

| Plan | Participants | Assets | Insurer | Rate |
|---|---|---|---|---|
| Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| **Molson Plan** | **9,715** | **$1,969,860,838** | **JP Morgan Chase** | **2.39%** |
| | | | **Prudential** | **2.39%** |
| | | | **Nationwide** | **2.39%** |
| | | | **Transamerica** | **2.39%** |
| | | | **Pacific Life** | **2.39%** |
| | | | **American General** | **2.39%** |
| | | | **MetLife** | **2.39%** |
| | | | **Lincoln National** | **2.39%** |
| | | | **State Street** | **2.39%** |
| | | | **MassMutual** | **0.00%** |

103. Throughout the Class Period, the Fidelity SVF in the Plan underperformed the comparator funds by an average of over 52%, as demonstrated in the table below.

| Year | Fidelity SVF Rate of Return in the Plan | Comparator Average Rate of Return | Fidelity SVF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2019 | 2.43% | 3.94% | 38.32% |
| 2020 | 2.06% | 3.75% | 45.07% |
| 2021 | 1.44% | 4.19% | 65.63% |
| 2022 | 1.51% | 4.13% | 63.44% |
| 2023 | 1.98% | 3.85% | 48.57% |

Case 2:25-cv-01371-WCG    Filed 09/09/25    Page 34 of 40    Document 1

| Average Underperformance during Class Period | 52.30% |
| --- | --- |

104. Notably, in 2021 the Fidelity SVF's crediting rate decreased while the Comparator GIC's crediting rates *increased*, indicating Defendants' failure to adequately investigate the prevailing marketplace and achieve similar adjustments in the same economy. Subsequent increases were still insufficient to bring the crediting rates in line with the prevailing marketplace and meaningful returns.

105. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Fidelity SVF's dismal crediting rate.

106. Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the Plan to transact at contract value. Indeed, many of the Comparator GICs had the same insurance carriers as the Fidelity SVF. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the Fidelity SVF.

107. The Fidelity SVF should be achieving at least the same performance of traditional guaranteed investment contracts.

108. In short, because the Plan held between $1.7 billion and $2.1 billion in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates under the same or better circumstances.

109. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or

by submitting requests for proposals to Insurance Companies and other providers of stable value investments.

110. By selecting the Fidelity SVF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

111. With the massive amount of assets under management in the Fidelity SVF, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[13]

## COUNT I
## Breaches of Fiduciary Duty of Prudence
### (against the Governance Committee and Investment Subcommittee)

112. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

113. At all relevant times, the Governance Committee and the Investment Subcommittee, and their members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

114. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent

---

[13] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

115. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

116. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Fidelity SVF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

117. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in her Prayer for Relief.

118. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company and the Governance Committee)**

119. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

120. Molson had the authority to appoint and remove members of the Governance Committee, and the duty to monitor the Governance Committee and was aware that the Governance Committee had critical responsibilities as fiduciaries of the Plan.

121. The Governance Committee had the authority to appoint and remove members of the Investment Subcommittee, and the duty to monitor the Investment Subcommittee and was aware that the Investment Subcommittee had critical responsibilities as fiduciaries of the Plan.

122. Collectively, Molson and the Governance Committee are referred to as the "Monitoring Defendants."

123. In light of their authority, the Monitoring Defendants had a duty to monitor the Governance Committee and the Investment Subcommittee, respectively, and to ensure that the Governance Committee and the Investment Subcommittee were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Governance Committee and the Investment Subcommittee were not fulfilling those duties.

124. The Monitoring Defendants also had a duty to ensure that the members of the Governance Committee and the Investment Subcommittee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company and Governance Committee.

125. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Governance Committee and the Investment Subcommittee, or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of their imprudent actions and omissions.

126. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

127. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by its failure to adequately monitor the Governance Committee and the Investment Subcommittee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in her Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a

39

constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: September 9, 2025        Respectfully submitted,

*/s/ Mark K. Gyandoh*
**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
James A. Maro, Esquire
PA Attorney ID #86420
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
      jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

*Counsel for Plaintiff and the Putative Class*